IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2012

## IN RE JOHNNY J.E.M.

**Appeal from the Circuit Court for Polk County**
**No. CV-11-009     J. Michael Sharp, Judge**

**No. E2011-02192-COA-R3-PT-FILED-MAY 29, 2012**

This is a termination of parental rights case with respect to Johnny J.E.M. ("the Child"), the minor son of Amanda M. ("Mother") and Joshua D. ("Father"). The Department of Children's Services ("DCS") removed the Child from Mother's home as a result of "serious environmental neglect." The Child was adjudicated dependent and neglected in Mother's care; he had no relationship with Father, who was serving a lengthy prison sentence throughout these proceedings. After taking the Child into custody, DCS soon placed him with Janice M. ("Foster Aunt") and her husband, Sonny M. (collectively "Foster Parents"), the prospective adoptive parents, where he remained for a year and a half before DCS sought to permanently sever the rights of the biological parents to the Child. Following a bench trial, the court granted the petition to terminate based on its dual findings, by clear and convincing evidence, that multiple grounds for termination were established as to both parents, and that termination was in the best interest of the Child. Mother and Father, represented by separate counsel, appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Sarah E. Coleman, Cleveland, Tennessee, for the appellant, Amanda M.

Wilton Marble, Cleveland, Tennessee, for the appellant, Joshua D.

Robert E. Cooper, Jr., Attorney General and Reporter, Marcie E. Greene, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

No appearance by Guardian ad Litem.

## OPINION

### I.

Trial was held in August 2011. Mother appeared in person, while Father participated by telephone from prison. He was represented in court by counsel. The proof showed that Father and Mother met in high school. Mother became pregnant when she was 21 and Father was 17; a paternity test established that Father was the Child's biological parent. Mother and Father did not continue their relationship, but Mother sent him pictures of the Child and, according to Father, Mother allowed him to see the Child before he was incarcerated for his most recent convictions.

DCS's involvement with Mother and her family reached back to cases involving Mother and her sister, Rosemary, while they were minors in the care of their mother, Mary M. ("Maternal Grandmother"). DCS became involved with Mother on that earlier occasion because she was not attending grade school; Maternal Grandmother explained she just "didn't like to go."

In November 2008, DCS was summoned by police to the mobile home where Mother and the Child lived with other family members including Maternal Grandmother and Mother's brother. On that night, Mother was arrested for vandalism after breaking a window during an altercation with her brother. DCS case notes indicate that the "inside of the home was dirty, there was spoiled food sitting out, the bedroom was in [dis]array, a dog was sleeping in [the Child's] bed with mud all over it, and roaches were everywhere. . . ." The case worker further noted, "[t]his is not the first time the police have been out to the home for domestic disputes . . . [and] no one has any regard for [the Child] seeing all of this." The case worker monitored the removal of the roaches and Mother's brother moved out. On follow-up visits, the worker found the home clean and free of cockroaches. She closed the case.

In April 2009, DCS Investigator, Nancy Findley, opened the current case after DCS was summoned to Mother's home because of a lack of supervision and environmental neglect of children who lived there – the visit was prompted by calls to police reporting nude children playing in a sprinkler outside the home in cool weather. According to Mother, the

children involved were her sister Rosemary's and not Mother's responsibility. Findley observed many dogs that apparently had ripped open garbage bags and strewn garbage all around. Maternal Grandmother reported they were strays that "just wandered into the home." Further, there was a cord running between Mother's trailer and Maternal Grandmother's trailer next-door by which they shared electricity. At this time, Maternal Grandmother reported that the family had no rent money and were close to eviction. Broken glass remained in the house from the November 2008 altercation, spoiled food was sitting out, and there were "roaches everywhere." Findley said Mother told her that she had a TennCare card but was not receiving other assistance such as "Families First," social security disability or food stamps. Maternal Grandmother claimed everyone, except the Child, as dependents and was receiving food stamps for the whole family. Findley noted that Mother relied on Maternal Grandmother to manager her finances and to dole out any assistance the family received. DCS provided pest control supplies and Findley took Maternal Grandmother to obtain SETHRA[1] assistance; paid Mother's past-due rent; and instructed Mother where and how to apply for disability benefits based on Mother telling her she had been a special education student and did not understand things very well.

As Findley monitored the case, the yard and home were cleaned, dogs were removed, and there was food in the home for a few months until July 2009, when DCS was called back. On this occasion, Findley saw that dogs – and this time more of them – lived inside and outside the house. The dogs obviously carried fleas; both Mother and the Child were flea-bitten. The home had no electricity and the roaches were "thick again." The only food was a jar of peanut butter, a few canned goods, a pack of hamburger meat, and a box of cereal. Findley organized church resources to supply Mother with cleaning supplies and pest control. Mother had started receiving food stamps. Mother was again urged to apply for social security disability. Findley referred Mother for in-house adult services and assistance, located churches and a food bank to provide more food and clothing, and DCS provided cash to pay the electric bill and to restore power to the home.

On her return to Mother's home the following month, Findley observed that the situation was worse. The electricity was turned off again, the cockroaches were "bad," and the children were eating with their hands out of old cereal bowls with maggots in them. The dogs remained and Mother and the Child had infected flea bite sores all over their bodies. It appeared to Findley that there were six children and three or four adults in the home – the Child, Rosemary's five children, Mother, Maternal Grandmother, Rosemary, and Mother's brother, the latter having returned. However, both Mother and Maternal Grandmother testified that Rosemary lived elsewhere and that Maternal Grandmother was raising

---

[1]SETHRA is an acronym for Southeast Tennessee Human Resource Agency.

Rosemary's children. None of the adults were employed and Mother relied on food stamps, friends and food banks to live. DCS decided to remove the Child for his health and safety and so the department could focus their efforts on Mother. A short time later, Mother agreed to the placement of the Child with Foster Parents; they, in turn, agreed that Mother could also come to live with them. After two months, Mother moved out of Foster Parents' home after they refused to allow her to take the Child with her to a mental health appointment. From that time forward, Mother lived with various relatives and moved frequently until the trial date. At one point, she got her own apartment, but lost it a month later when her disability benefits were cancelled and she had no other source of income.

Mother agreed that the description of the Child's living conditions and DCS's involvement with her family were "kind of" accurate. She clarified, however, that she herself applied for food stamps and "Families First" assistance and had been receiving benefits of $225 a month since the Child was an infant. She conceded there "wasn't that much" food in the home. Mother said she spent all the money she had on the Child, while Maternal Grandmother paid her rent and utilities with the disability benefits that Rosemary's children received. Mother, Maternal Grandmother and all six children subsisted on about $800 a month in benefits. Mother attributed the lack of electricity, running water or food in her home when the Child was removed to the fact that she was in the process of moving in with Rosemary.

Mother testified that she had moved into her own two-bedroom home in Copperhill the day before trial began. She did not know the address, but said she paid $400 a month in rent and her sister provided furniture. She explained that she had been working full-time since May 2011, cleaning cabins at a rafting camp called Whitewater Express. Mother said she earned $1,000 a month and continued to receive food stamps. Mother believed her job was available year-round and, if the Child lived with her, either Rosemary or Father's mother, would babysit while she was at work.

Mother said she had not informed her current case worker, David Griffith, that she was employed because she did not like him. She said he had not helped her. She testified that she completed an eight-session parenting class that taught her how to discipline the Child by using time outs. Mother said she didn't learn anything that she did not already know. She conceded that she did not provide DCS with her certificate of completion. Mother acknowledged that her case manager filled out Mother's application for disability benefits with information and answers supplied by Mother. However, she denied the accuracy of most of the information on the form.

DCS case manager Barbara Mayer initially handled both Mother's case and Rosemary's case after their children were removed from Mother's home at the same time.

Mayer noted that Rosemary completed her plan's requirements, which were essentially the same as Mother's, and was reunited with her five children within a few months. Mayer described Mother's plan as "the most basic of plans." Ms. Mayer's initial "high hopes" that Mother would complete her required tasks were, according to the manager, never realized.

At the time of trial, the Child had lived with Foster Parents for about two years. Foster Aunt testified that she and her husband agreed to take the Child and, later, Mother, in the hope that this would give Mother "time to get her life straightened out to have [the Child] back." Mother was not asked to pay rent, or do any chores, but to focus only on caring for the Child. That said, Mother never offered to do any cleaning or cooking. Foster Parents talked to Mother about feeding the Child regular, healthy food, but noted that the Child "does what he wants to with [Mother]. . . . He's the boss." Mother insisted that the Child was potty trained when he came to Foster Parents' home, but Foster Aunt found this not to be the case. When Mother moved out, she left no contact information; she would return unannounced to see the Child. Foster Aunt never observed Mother discipline the Child; Mother simply did what the Child wanted.

A former neighbor described Mother as "a very good mother" whom the Child obviously loves. She commented that "[e]verywhere she was he was." Another neighbor similarly observed that Mother was always "hovering" over the Child and he appeared healthy and happy. The witness described their relationship as "just wonderful" and added, "[i]t's the kind that made you smile when you saw them because you know it was all good. . . ." She acknowledged that Mother struggled and had borrowed water from her on occasion.

David Griffith, DCS case manager, took over the Child's case in January 2010. At their meeting, Griffith had no reason to believe he could not work with her. Griffith read the plan's requirements "word for word" to Mother, and explained the whole plan and the termination criteria in simple terms. Mother told Griffith that she understood the need to complete each requirement, but would not further discuss the plan with him. Griffith continued the same plan and extended the time for Mother to meet her goals, but never saw progress. Griffith said Mother refused to confirm her address and did not often call him to check on the Child or her case. As a result, he was unable to offer more services to her. In contrary testimony, Mother testified she provided both of her case workers with her address and always had a working cell phone. Neither of the DCS case workers had any contact with Father about the Child's case and no one from Father's family had sought contact with the Child.

At the time of trial, Father was incarcerated on a fifteen-year sentence imposed in 2008. He explained that he was "at the wrong place at the wrong time and . . . got especially

aggravated robbery and especially aggravated kidnapping charges." He was also convicted for a 2005 arson and conspiracy to commit aggravated robbery. Father had an extensive criminal record that included offenses before and since the Child's birth. Father had little knowledge of the Child's situation, but he said Mother had allowed him and his family to see the Child before he went to prison. He sent cards for the Child to the paternal grandmother and assumed she gave them to Mother.

Mother returned to the stand and presented photographs of her new trailer and the various rooms and furnishings, including a bed, dresser, and toys for the Child. She reiterated that, after speaking with her boss, she fully expected to continue at her present job even during the fall and winter months. Asked why the Child should be returned to her, Mother testified, "[b]ecause he's my kid. I miss him." She was confident she could care for him and planned to rely on her sister if she needed help.

After the hearing, the court concluded that "it is appropriate . . . to permanently terminate the parental rights of both [Mother and Father] to the [C]hild , . . . and to free him for adoption." As to Mother, the court found that termination was supported by clear and convincing evidence that Mother failed to comply substantially with the terms of the Child's permanency plan, and "persistent conditions exist in Mother's life that prevent the [C]hild from returning safely to her care." *See* Tenn. Code Ann. §§ 36-1-113(g)(2),(3) (2010). As to Father, the court found, also by clear and convincing evidence, that termination was warranted on the following grounds: (1) that Father was sentenced to more than 10 years in prison when the Child was under the age of eight and (2) that Father abandoned the Child by engaging in pre-incarceration conduct that exhibits a wanton disregard for the Child's welfare. *See* Tenn. Code Ann. §§ 36-1-113(g)(1)(6) and 36-1-102(1)(A)(iv) (2010). Mother and Father, represented by separate counsel, appeal. They challenge grounds for termination as well as the trial court's best-interest analysis.

II.

Mother presents the following issues for our review:

> 1. The trial court erred in determining that there was clear and convincing evidence to support the termination of Mother's parental rights based upon a persistence of conditions.
>
> 2. DCS failed to provide reasonable efforts to assist Mother in remedying persistent conditions, thereby negating this ground for termination.

3. The trial court erred in determining that there was clear and convincing evidence to support the termination of Mother's parental rights based upon substantial noncompliance with the permanency plan.

4. The trial court erred in determining that there was clear and convincing evidence to show that termination of Mother's parental rights was in the best interest of the Child.

Father presents additional issues as follows:

1. Did the trial court err in finding that Father's pre-incarceration conduct exhibited a wanton disregard for the Child?

2. Does Tenn. Code Ann. § 36-1-113(g)(6), as currently interpreted by the courts, run afoul of the State of Tennessee and United States Constitutions?

III.

We employ the following standard of review in cases involving the termination of parental rights:

[T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). "This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Tenn-Tex Properties v. Brownell Electro*., 778 S.W.2d 423, 426 (Tenn. 1989). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. **Stanley v. Illinois**, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); **In re Drinnon**, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and also the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See* **Blair v. Badenhope**, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c); **In re F.R.R., III**, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, **State v. Demarr**, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. **In re Valentine**, 79 S.W.3d at 546; **In re S.M.**, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

In the present case, the order terminating Mother's and Father's rights implicates Tenn. Code Ann. § 36-1-113(g) which provides, in pertinent part, as follows:

> Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan. . . ;
>
> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home. . . .

\*    \*    \*

(6) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv), referenced above, defines "abandonment," in relevant part, as follows:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .

V.

A.

Mother challenges the termination of her rights based on the trial court's finding of conditions that persisted after the Child's removal. Mother contends that she has "turned her life around" and asserts that the conditions that led to the Child's removal no longer exist. Mother also asserts that DCS failed in its obligation to make "reasonable efforts" to assist her to do the things that were necessary for the Child's return. We address these related issues in turn.

The trial court made the following relevant findings:

> DCS proved by clear and convincing evidence that persistent conditions exist in [Mother's] life that prevent the [C]hild from returning safety to her care. . . . DCS removed the [C]hild from [Mother's] home on August 4, 2009; the [C]hild has been in foster care for two years. DCS removed the [C]hild from [Mother's] home due to his mother's ability to provide him a safe environment or to parent him adequately. Those conditions still exist, although the [C]hild has been in foster care half his life. Despite her last-minute acquisitions of a job and a home, [Mother] has provided no evidence that she will keep either the house or the job long-term. She remains unable to provide the [C]hild with consistent basic care or competent parenting.
>
> [Mother's] history of instability and lack of parenting skills have continued over the [C]hild's entire life despite DCS's efforts to help. The court finds that her lack of judgment provides ample evidence that she cannot meet the [C]hild's needs. She testified that she had no problems or reservations about being with [Father] who was a convicted felon. She lied on an application to receive SSI benefits. She fills prescriptions for depression medication – provided by state funds – and throws the medication away on a regular basis. She shows no ability to make decisions that are in her own best interests. The court finds that she will not make suitable decisions to rear and protect the [C]hild adequately, now or in the future.

-10-

Lastly, the court found that "continuation of [Mother's] parental rights to the [C]hild greatly diminishes his chance to permanently be made part of a safe and stable home."

The evidence shows that, at the heart of Mother's problems, which ultimately caused the Child to be separated from her, is her inability to demonstrate she could provide for the Child's basic, everyday needs for any length of time. The trial court's findings reflect a complete lack of confidence that Mother's "last minute and very minimal" actions represented the long term stability and consistency that the permanency plan was intended to help her achieve. In our view, the evidence does not preponderate against the trial court's assessment. Stated differently, Mother obtained, but failed to show that she could *maintain* either housing or employment, and never demonstrated that she could effectively parent the Child. All the while, the Child remained in foster care for over two years. Given such evidence, the trial court concluded that the Child deserved a chance at long-term stability in the safe, loving home that Foster Parents had selflessly provided.

The evidence does not preponderate against the trial court's finding that the conditions which led to the Child's removal essentially persisted at the time of trial, notwithstanding proof of Mother's most recent employment and housing. The trial court did not err in terminating Mother's rights based on persistent conditions.

B.

The trial court expressly found that DCS established that it made reasonable efforts to assist Mother in satisfying her obligations under the plan and remedying the conditions that caused her and the Child to be separated. The court found that DCS worked with Mother "to set goals and develop tasks" intended to lead to reunification; attempted to help her gain parenting skills; and assisted her in obtaining social security benefits. The court noted, however, that, as a result of Mother continually moving and failing to maintain contact with DCS, her case managers were unable to provide further assistance.

This Court has often acknowledged that "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H*., 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004); *State Dep't of Children's Servs. v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946776, at *10 (Tenn. Ct. App. M.S., filed Aug. 13, 2003)). DCS certainly had an obligation to exercise reasonable efforts to assist Mother in working toward reunification. Tenn. Code Ann. § 37-1-166(a)(2), (g)(2). We have further observed, however, that

the manner in which the Department renders services must be *reasonable*, not herculean. In addition, the Department is not required to shoulder the burden alone. The parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required the removal of the children. The reasonableness of the Department's efforts should be decided on a case-by-case basis in light of the unique facts of the case.

*In re Bernard T*., 319 S.W.3d 586, 601 (Tenn. Ct. App. 2010)(internal citations omitted; emphasis added).

In the present case, the proof shows that DCS first tried to work with Mother to help her provide the Child with a safe, clean living environment so as to prevent his removal. Several times, DCS provided pest control and cleaning supplies to Mother and provided or organized other resources to supply the family with food, utility service and rent. In addition, DCS provided contact information and an itemized list of things Mother would need in order to apply for disability benefits. Ms. Findley offered to transport Mother and Maternal Grandmother to submit the application, but Mother never followed through. More than once, Mother temporarily addressed the living conditions in the home, but then allowed them to deteriorate again. According to Ms. Findley, "[t]hat was our concern – she would clean up long enough for us to start to close the case, but we didn't know how they would survive after we did . . . because they were refusing to utilize the resources that we had placed in the home."

After DCS determined it was necessary to remove the Child, they attempted to work more closely with Mother to get her "more resources and some independent living skills." Both of the Child's case managers painstakingly reviewed the permanency plan and the termination criteria with Mother, which she said she understood; DCS also extended the time for her to complete her responsibilities, all to no avail. An ideal situation seemed to present itself when Foster Aunt agreed to take Mother, as well as the Child, thus giving Mother time to learn new skills and find a job or obtain other forms of income. Mother agreed that her caseworker had worked to make it possible for both Mother and the Child to live with Foster Parents. Asked what she was supposed to do in their home, however, Mother replied, "[n]othing." After a few months, during which time she claimed to learn nothing from Foster Aunt, Mother not only left the home, but she turned down Foster Parents' offer to live rent-free in another home they owned until she "got her feet on the ground." Instead, Mother began moving from place to place, living with various relatives for months at a time, and did not provide her address or maintain regular contact with DCS. According to Ms. Mayer, Mother's visits with the Child fell off very quickly and she could not persuade Mother to work on other aspects of the "most basic" permanency plan; although Mother had no driver's

license, she turned down Mayer's offers to provide transportation to help her look for a job or accomplish any other task on the plan. Mother reported that she had looked "everywhere" for a job, but never provided any evidence so Mayer could verify her job search efforts. When Mayer took Mother to apply for public housing, she discovered that Mother was ineligible because she had a criminal record. As to sources of income, Mother never followed through with applying for disability benefits until Mayer sat down with her and Maternal Grandmother and assisted her in completing the application.

Mayer testified that every time she did see or speak with Mother, she reviewed the permanency plan requirements, asked what steps Mother had taken, and reiterated what Mother needed to do. Mayer testified: "it's part of my job to help the people get their children back. It's not part of my job to keep the kids." She observed that while she made herself and resources available, she was "only going to do as much as the parent." As to the Child, DCS enrolled him in Head Start, obtained basic medical and dental care, and placed him with Foster Parents in an effort to keep him within his extended family unit.

The evidence does not preponderate against the trial court's finding that DCS satisfied its obligation to make "reasonable efforts" to assist Mother toward reunification with the Child. Despite such efforts, however, Mother made no significant progress until the time of the termination hearing, when there was some suggestion that she had begun to take steps in the right direction. Unfortunately, her efforts came too late.

In our view, Mother's failure to act sooner cannot be attributed to any failure on the part of DCS. Accordingly, the evidence does not preponderate against the trial court's determination that DCS exercised reasonable care and diligence – that is, "reasonable efforts" – to provide services related to meeting the needs of the child and the family. *See* Tenn. Code Ann. § 37-1-166(g)(1) (2010).

VI.

Mother challenges the finding of substantial non-compliance with the permanency plan as a ground for terminating her parental rights. She contends that she completed most of the plan's requirements and DCS failed to present clear and convincing evidence to the contrary. We disagree.

The initial permanency plan was developed in August 2009 with Mother's participation. As the trial court observed, the "plan's goals were simple, asking only that [Mother] provide the [C]hild the basic care that the [C]hild needed: – a stable and clean home, ample food, clothing and other necessities and effective parental care and nurture." The plan was updated a year later, but the requirements were the same. Case manager

Griffith testified he made no changes because he had seen no evidence of progress by Mother. As accurately summarized by the court, the plan required that Mother

> provide the [C]hild a stable and clean home by getting, at least, a two-bedroom home for herself and her [C]hild only; maintaining all the home's utilities; keeping the home clean and insect-free; and making sure DCS knew where she was living;

> get adequate income by applying for and obeying any requirements of government assistance programs; getting a job; and learning to live within her means; and

> provide the [C]hild appropriate care and nurture by working with DCS to assess her homemaking skills and increase her skill level, participating in and completing a parenting class that included effective discipline techniques, and by demonstrating the ability to effectively parent her [C]hild. The plan also required her to pay traffic fines and get back her driver's license.

The trial court made extensive findings in support of its conclusion that Mother did not fulfill her obligations. Among the more pertinent findings are the following:

*   *   *

> **Housing**: [Mother] did not inform her case manager of any of her addresses. She did not provide any other ways to keep in touch with her. She did not contact DCS regularly.

> [Mother] was still living with [Maternal Grandmother and Rosemary] on the day that this trial began, however, she announced on the first day . . . that she had just rented a home of her own and was moving that day. She was unable to give the court her new address or a written lease. She testified that the rental home would cost $400 a month. On the first day of trial, there was no furniture in the home. By the last day of the trial, [Mother] provided photographs that she testified depicted the home with a few pieces of furniture in it. [Mother] said [Rosemary] gave her the furniture. No one else testified concerning the home's condition. DCS was not able to inspect

-14-

the home due to the fact that they were only made aware of the home during the first day of this trial.

**Income**: [Mother] testified that she did not know where any of their money or food stamps went – . . . she relied on [Maternal Grandmother] to provide for her and the [C]hild.

[Mother] provided the case manager, Barbara Mayer, a list of places she had applied for jobs from November 2009 until January 2010.

\* \* \*

The list did not contain most of the information Ms. Mayer asked [Mother] to provide – telephone numbers and names of people that [Mother] contacted, so that DCS could verify that [Mother] actually submitted applications.

After January 2010, [Mother] did not give DCS any other evidence that she had tried to find a job. The court finds [Mother's] testimony concerning her search for a job was not credible.

\* \* \*

[Mother] got SSI payments based largely on her claimed depression, which had been diagnosed by her doctor. [Mother] testified to this Court, however, that she was not depressed at the time of trial and that she was not depressed when she signed the SSI application, nor had she ever suffered from depression.

\* \* \*

The court finds that [Mother] was not truthful when she completed her application nor has she been truthful with her physicians or otherwise with this court related to the issue of her depression.

\* \* \*

-15-

[Mother's] answers on the SSI application will make it difficult for her to get a job: She testified that she does not like people, she does not deal well with authority figures, she does not handle stress well, she gets angry when stressed, she cannot complete tasks because she cannot follow directions, written and spoken instructions are difficult for her to follow, and she cannot do math and cannot keep a checkbook.

[Mother] testified that she now has a job cleaning cabins at a rafting company. She testified that she got this job in May 2011. However, she did not tell her case manager that she had a job. She provided the Court with pay stubs[2] showing that she was earning $1,000 a month. She brought home $425 bi-weekly. [Mother] testified that she was certain that her job would continue through the winter months, stating that the rafting company had programs in cold weather that used the cabins. Because she did not tell DCS that she had the new job, DCS was unable to verify how long the job would last. However, the court takes judicial notice of the fact that the rafting season comes to a close, for the most part, from September through May of each year. Therefore, this court does not believe [Mother's] job will continue, at least not at the same hours worked, for the fall and/or winter season.

**Effective parenting**: DCS arranged for [Mother] to live with [the Child] at [Foster Parents'] home so that she could learn parenting skills and so she could bond with her [C]hild. They required her only to care for the [C]hild and for her to maintain her room. [Foster Aunt] took care of the rest of the housekeeping and cooking.

When [Mother] vacated the home, [Foster Aunt] found piles of soiled diapers wadded up and hidden in the closest of [Mother's] room.

[F]or the most part, [Mother] did not help around the home. She did usually feed the [C]hild, usually . . . potato chips, yogurt and

---

[2]The record contains one pay stub for the two-week period ending on July 23, 2011 in the net amount of $425.21. The gross "year-to-date" earnings are shown as $1,925.14.

fruity juices. She allowed him to carry a sippy cup . . . all the time. Therefore, the [C]hild rarely ate healthy food. [Mother] testified that she helped with the housecleaning and cooking. . . . The court heard testimony of [Foster Aunt] that [Mother] did not assist with cleaning the house, nor did she cook. She testified that [Mother] never offered to help out in any way. The court finds that [Mother's] testimony was not credible on these issues.

\* \* \*

[Mother] was required to demonstrate her improved parenting skills after she took the parenting class. She never did so.

\* \* \*

[Mother] testified that . . . she gets angry when stressed. The court has great concern with her potential anger episodes when faced with the stresses involved with the full time parenting of a young small child.

(Bold lettering in original; footnote added.)

As the trial court found, the plan "was designed to help [Mother] learn how to correct the problems that caused the [C]hild's removal into foster care." At trial, however, there was no evidence that Mother had made lasting, verifiable changes to her situation. As to suitable, stable housing, the evidence showed that Mother waited literally until the eve of trial to find a place for her and the Child to live. Before then, Mother moved from place to place and lived with relatives and failed to furnish DCS with her address or basic contact information. Mother did not qualify for public housing because of her criminal record and lost the only home she was able to get on her own because of lack of income after only a few months. When questioned at trial about the house she had just found, Mother could not provide the address, but later produced (1) a generic receipt, purportedly for that month's rent of $400 and (2) photographs. Mother presented no verifiable proof of her search for employment and nothing to corroborate her testimony that her recently-acquired job was stable. As to her parenting skills, Mother presented only a certificate showing she had completed a parenting class. The trial court considered all of the evidence and essentially found that Mother's actions were "too little, too late." The evidence does not preponderate against this clear and convincing finding of the trial court.

Mother presented evidence suggesting that, just before trial, long after the Child's removal, she had begun to address the plan's most basic requirements. However, Mother never kept DCS informed. As a consequence of this failure, DCS was never able to confirm her new-found housing and recent employment. The trial court discredited much of Mother's testimony and remained unconvinced that Mother had made lasting changes. Under similar factual scenarios, this Court has upheld terminations orders based on the failure to comply with a permanency plan. In *In re J.D.L.*, No. M2009-00574-COA-R3-PT, 2009 WL 4407786 at *16 (Tenn. Ct. App. M.S., filed Dec. 2, 2009), we concluded:

> The court also relied on Mother's failure to comply with her plans' requirements to establish stable income and obtain stable housing, which the record supports. The determinative question therefore is whether Mother's failure to secure stable housing and income is "substantial" noncompliance. The Tennessee Supreme Court has defined "substantial" noncompliance as that "'[o]f real worth and importance,'"explaining that courts should determine the real worth and importance of a parent's noncompliance by considering the degree of noncompliance and the importance of the disregarded requirement. We focus here on the great importance of establishing a stable setting in which to raise and support these children and conclude that Mother's failure to make any meaningful attempts to obtain stable income or housing amounted to substantial noncompliance. Mother's belated efforts to find housing and income less than two weeks before the final termination hearing were "too little, too late."

(Internal citations omitted.) *See also, e.g., In re R.T.S*, No. E2002-02227-COA-R3-JV, 2004 WL 73271 at *6 (Tenn. Ct. App. E.S., filed Jan. 16, 2004)(holding that "Mother's and Father's last minute efforts cannot provide the basis for a conclusion that [this] statutory ground[] ha[s] not been proven"); *DCS v. B.L.K.*, No E2002-01724-COA-R3-JV, 2003 WL 21220830 at *8 (Tenn. Ct. App. E.S., filed May 20, 2003 )(holding that "Mother's last minute ability to secure employment two days before the second day of trial began, as well as the scheduling of a therapy session in the near future is, quite simply, too little too late").

In the present case, the evidence does not preponderate against the trial court's determination that, despite her recent actions, Mother failed to comply substantially with the requirements of the permanency plan. The trial court did not err in terminating Mother's rights on this ground.

VII.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." ***In re Marr***, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Once grounds for termination have been found, the focus of the proceedings shifts to the best interest of the child. ***Id***. Having concluded that the trial court properly terminated both Mother's and Father's rights, we next consider whether the decision is also in the best interest of the child.[3] We are guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(c).[4]

---

[3] Although Father does not challenge the trial court's best-interest determination, we review this issue as to both Mother and Father.

[4] The factors to be considered by us are as follows:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(continued...)

The trial court set forth its best-interest analysis, as to both parents, as follows:

\* \* \*

The court finds that DCS proved by clear and convincing evidence that it is in the [C]hild's best interests for termination to be granted as to [Mother] because, despite her ability to use the [C]hild's two-year stay in foster care to better herself and despite DCS's attempts to help her, she has failed to show that she can make and keep a home or a job. She has not shown that she can adequately, nor effectively, parent the child. While [Mother] may have made some very recent changes in her condition, she waited until just before the trial in this case began. This was an extremely long time after DCS filed its petition – to do so. It does not appear that she took the matter to heart until recently, nor does it appear to the court that the changes that she made are permanent changes. Her actions in this matter cause the court to believe she does not recognize a real need to change. Therefore, the court does not believe that she will change long term.

DCS proved by clear and convincing evidence that it is in the [C]hild's best interests for termination to be granted as to [Father] because he is in jail and likely to remain there until the [C]hild is almost an adult. He cannot provide the [C]hild a home or protect the [C]hild in any way. His violent past shows that he poses a danger to the [C]hild. Although he knew that the [C]hild is in foster care, he made no attempt to contact him. The

---

[4](...continued)

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[C]hild has never met [Father] – they have absolutely no bond.

DCS also proved . . . that it is in the [C]hild's best interests for termination to be granted as to both [Mother and Father] because changing care givers at this stage of his life will have a detrimental effect on him. He has made great strides in [aunt and uncle's] home, and he calls [aunt and uncle] "mom" and "dad." The court finds that this [C]hild has thrived in . . . their care.

(Internal citations omitted).

At trial, Foster Aunt said they brought the Child into their home with no intention of adopting him. They testified that they did not need or expect any payment in return. In the years since then, Foster Parents had bonded with the Child, love him, and wish to adopt him. Foster Aunt related that the Child was happy, loved playing with other children, loved school, and loved eating everything except mashed potatoes.

In summary, it is clear to us that the trial court conducted a most thorough analysis and concluded that all indications pointed to terminating both Mother's and Father's rights and making the Child available for adoption as the best course of action for the Child. Viewing the situation from the perspective of the Child, as we must, we do not find that the evidence preponderates against the trial court's conclusions.

VIII.

Next, we consider the issues presented by Father. Father challenges the termination of his rights, which termination is based upon the fact that he effectively abandoned the Child when he "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. 36-1-102(1)(A)(iv). Father asserts that the evidence in support of this ground was neither clear nor convincing. He concedes he has an extensive criminal history, but asserts that there was no evidence that he committed any of his offenses in the Child's presence or that they had a direct effect on the Child, "other than the fact that his incarceration meant that [Father] could not be there to visit and support [the Child]."

As we have noted, at the time of trial, Father was in prison pursuant to his guilty pleas leading to his convictions for committing especially aggravated kidnapping and especially aggravated robbery in April 2008, conspiracy to commit aggravated robbery in May 2008, arson in 2006, and violation of probation. The various sentences were ordered served

concurrently, resulting in an effective 15-year prison sentence.[5]  Father conceded that his criminal history included an earlier felony conviction for burglary, numerous misdemeanors, and repeated probation violations.

With respect to the ground of abandonment by wanton disregard, the statute does not expressly limit the conduct to any particular four-month period prior to incarceration. *See In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005).  Neither are the crimes that lead to the parent's incarceration the only conduct that the court may consider.  This Court has held that "[e]xamples of wanton disregard might include conduct such as 'probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child.' " *In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199 at *4 (Tenn. Ct. App. M.S., filed Aug. 12, 2009)(quoting *In re Audrey S*., 182 S.W.3d at 867-68).

As to Father, the trial court found that

> [b]efore going to jail, [Father] committed a succession of violent crimes – both before and after the [C]hild's birth. [Father's] history of a series of violent crimes demonstrates his lack of ability to raise his child in a healthy and moral environment, his lack of judgment and his lack of concern that committing crimes might lead to incarceration preventing him from bonding with or protecting the [C]hild. [Father] is unfit to parent the [C]hild.

Father asserts that the only violent crimes he committed are those for which he is currently incarcerated.  He makes much of the trial court's reference to a history of violent crimes.  On our review, we agree with Father that his criminal history could have been presented in a less confused fashion – in chronological order, for instance, and in such a way that arrests were distinguished from convictions, etc.  Presumably, the trial court may have considered Father's arrest on two counts of assault in December 2006, in addition to his more recent offenses, in noting his several "violent" crimes.  While the judgments in the assault case are not before us, the record indicates that those charges were dismissed, but Father's probation was revoked as a result of the unreported arrests and he served 90 days in jail.  In any case, Father conceded he had "quite a record" and the record reflects a history of criminal behavior and a long-standing disregard for the law as he continuously violated the

_____

[5]At trial, Father testified that he expected to be released after serving 85% of his sentence.  We observe that the judgment reflects that for the especially aggravated kidnapping, he was sentenced as a violent offender to serve 100% of his sentence.

terms of his probation. Notably, it appears that after Father was aware that he had the Child to consider, the seriousness of his criminal conduct only escalated. Father's most recent convictions stemmed from a 2008 robbery and kidnapping in which Father and his partner admitted, through their guilty pleas, to using a gun and beating the victim. His criminal conduct aside, the evidence further shows that Father provided no child support and did not otherwise act with the Child's best interest in mind.

The evidence does not preponderate against the trial court's finding that Father's pre-incarceration conduct evidenced a wanton disregard for the Child's welfare. The trial court did not err in terminating Father's rights on this ground.

IX.

As to Father, the trial court found the existence of a second ground for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(6). Again, that section provides for termination where the "parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered. . . ." *Id*. As discussed in the previous section, Father received an effective fifteen-year sentence for his multiple felony convictions, and judgment was imposed before the Child turned two.

Initially, Father does not contest the evidence terminating his rights pursuant to Section 36-1-113(g)(6), nor could he successfully do so. The sentencing judgments for his 2008 convictions indisputably establish the existence of this ground. Father instead argues that the statute, as applied by our courts, is unconstitutional because it employs a bright-line rule with no regard for whether an incarcerated parent actually serves the sentence imposed. Father suggests that there would be little harm and would be a potential benefit to instituting an eighteen-month "waiting period" after entry of judgment before termination could be pursued.

First, as DCS correctly notes, Father presents this issue for the first time on appeal and it is thereby waived. "It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court." *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996). It is also an established principle of law that constitutional issues need not be decided where a case can be resolved on non-constitutional grounds. *Watts v. Memphis Transit Management Co.*, 224 Tenn. 721, 727, 462 S.W.2d 495, 498 (1971). In the present case, we have already determined that Father's rights were properly terminated on another, independent ground. Because the existence of a single ground is all that is required to support a termination order, we will not dwell on this issue. Suffice it to say, however, that this Court has previously upheld the constitutionality of Section 36-1-113(g)(6). In *Worley*

***v. State***, No. 03A01-9708-JV-00366, 1998 WL 52098 at *1 (Tenn. Ct. App. E.S., filed Feb. 10, 1998), we observed:

> The statute under attack bears a real and substantial relation to furthering the best interests of children, and such statutes permissibly afford greater protection to the minor's interest than to the rights of a parent. The legislature has expressed as a compelling state interest that minor children not remain permanently in foster care. T.C.A. § 36-1-113.
>
> The appellant, by his own acts, has severely diminished, if not nullified, his ability to discharge his role as a proper parent. When the parenting role is not or cannot be fulfilled, under the doctrine of *parens patriae* the State has a "special duty" to fulfill that role. The proper parental role in the life of a child under eight years is crucial to the child's welfare, and there is a compelling need for the State to protect the best interests of the child in this regard. The statute under consideration properly addresses and furthers that interest. For a parent who is unable or unwilling to care for the child's best interest, a statute that enables the State to terminate parental rights on these grounds does not violate the process clause of the Constitutions.

(Internal citations omitted; italics in original).

For the foregoing reasons, and each of them, we conclude that the trial court did not err in terminating Father's rights pursuant to Section 36-1-113(g)(6). Father is entitled to no relief on this issue.

X.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Amanda M. and Joshua D. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE